Whitaker, Judge,
delivered the opinion of the court:
Defendant leased from plaintiff a tract of 107.1 acres on the south bank of the Savannah River near Savannah, Georgia. It was to be used by defendant for an extension of an adjoining shipyard being operated for the defendant by the Southeastern Shipbuilding Corporation. On it the defendant intended to erect various buildings and a dock.
Article III of the lease provided:
The Lessor further agrees that it will not make or assert any claim on account of damage or injury of whatsoever nature caused to the leased premises by an act or omission of the Lessee or any of its agents, employees, or independent contractor employed by it in connection with the removal from the leased premises of any facilities, structures, buildings, or other property of whatsoever nature. The leased premises, however, from which any facilities are removed, shall be restored to as good a condition as they were prior to the acquisition, construction, or installation of such facilities.
On May 21, 1948, the War Assets Administration, which had taken over the property from the United States Maritime Commission after the war, notified plaintiff that it would surrender the lease effective July 31,1948, and would remove the improvements placed on the property. The lease was surrendered and the improvements were removed, except that there was left on the premises concrete building foundations and concrete slabs, called platens, a part of the superstructure of the dock, and the pilings which had been driven into' the. bed of the river to hold up the dock. Plaintiff demanded the removal of all of these things, or, in the alternative, the payment of the cost of their removal. Upon the rejection of this demand, plaintiff brought this suit.
The Commissioner has found that the cost of the removal of the concrete building foundations would be $11,760; that the cost of removing the platen foundations would be $11,550; and the cost of removing the dock superstructure would be $11,250. The parties agree on these figures. The *139 Commissioner has also found that it would cost $52,400 to remove the piling. The defendant accepts this figure, but the plaintiff says that it would cost at least $102,000 to remove it.
Defendant admits that plaintiff is entitled to the cost of removing the above-mentioned things from the premises, but it says that there should be offset against this cost the increased value of the premises resulting from filling it in by the defendant, which, it is agreed, is $70,000.
The two issues in the case are, therefore, the cost of removing the pilings, and defendant’s right to offset the value of the improvement on the property against the cost of removing the remainder of the structures.
The pilings were driven down through about 10 or 12 feet of mud in the bottom of the river, and into the marl which was underneath the mud. Defendant’s engineer testified that the cost of removing them would be $5.00 a pile, if they were driven only down to the marl, but that it would probably cost as much as $15.00 a pile to completely remove them if they had been driven into the marl. Defendant’s engineer also testified that the property would not be injured for future use if the piles were merely broken off at the marl line; and that this could be done for $5.00 a pile.
But plaintiff’s engineers say that breaking them off at the marl line would not permit another dock to be erected at this site unless it was of the same character as the dock erected by the defendant. They admit that if a dock of the same character was to be erected in the future, that the stumps of the old piles could be used as a foundation for any new piles that might be driven for a later structure. About the only trouble they could foresee was the possibility that a future occupant might want to reinforce the underpinning of a dock he might want to erect at some place other than where it had been reinforced by defendant. In this event they say they could not drive reinforcing piles because they would encounter the remainder of the piles left by defendant.
Defendant’s engineer said this would present no difficulty because if they did, the new pile would just glance off and go on down by the side of the old pile. This seems reasonable to us. Even where the dock had been reinforced by *140 defendant the piles were at least two feet apart and considerably further apart at other points. There was, therefore, plenty of room for the new piles. We are unable to see how leaving the stumps of the old piles would materially injure the property for future use.
The Commissioner has allowed $52,400 for the cost of removing these piles. Since there were from 6,500 to 7,100 piles, this is an allowance of between $7 and $8 a pile for removing them. It seems to us that this is a reasonable figure. The defendant does not contend that it is too much.
We are also of the opinion that defendant is not entitled to offset the enhancement in value of the property from filling it in against the admitted obligation of the defendant to remove the concrete foundations and piles, because there is no provision in the lease which authorizes it. The parties knew the defendant would fill in the property, because it was not usable without it, but no provision was made for compensating the defendant therefor upon termination of the lease. Defendant filled it in not at the demand or request of the plaintiff, but of its own volition. It was done not for the benefit of the landlord, but for the lessee’s benefit. The resulting benefit to the landlord was incidental to the defendant’s use of the property. In such case there is no obligation on plaintiff to reimburse defendant for the cost of doing so, in the absence of a provision in the lease requiring it.
In 32 Am. Jur. p. 524, it is said:
In the absence of any agreement between the parties, there is no obligation on the part of the lessor to pay the lessee for improvements erected by the latter upon the demised premises, even though the improvements are such that by reason of their annexation to the freehold they become a part of the realty and cannot be removed by the lessee.
Ample authority is cited to support the text, including Kutter v. Smith, 2 Wall. 491.
It may seem inequitable to put defendant to the expense of removing these things that might impair a future use of the property without giving it credit for what it did to improve the property; but that is the way the lease was written, and it was the defendant who wrote the lease. We can only *141 give effect to what was written, and not to what the defendant now thinks should have been written.
Defendant says the lease provides that the property shall be restored to as good a condition as it was when the lease was executed, and not to the same condition. Hence, it says if the value of the improvements equals the impairment in value, the condition of the lease is satisfied.
But this is not what the lease says. It says the lessor will make no claim for damage to that part of the property from which structures or facilities erected by defendant are removed, with the proviso that that part of the leased premises from which structures are removed shall be restored to a condition as good as they were before erection of the structure. What the parties had in mind was the effect on the property of the erection of the structures and their removal. They evidently did not have in mind improvements to the property unrelated to the erection and removal of structures on it.
If plaintiff gets a windfall, it is defendant’s fault in not providing for this contingency. As the lease was written, plaintiff is entitled to recover the cost of the removal of those things erected by defendant which impair its value, and defendant is not entitled to offset any improvements made.
We are of opinion that plaintiff is entitled to recover the sum of $86,960. Judgment for this amount will be entered.
It is so ordered.
Laramore, Judge/ Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation created, organized, and existing under the laws of the State of Virginia, is a common carrier by railroad of persons and property for hire in the Southeast section of the United States, serving among other localities the City of Savannah, Georgia, where it owns improved and unimproved lands, among which are 107.1 acres of waterfront property on the south bank of the *142 Savannah River near Savannah, Georgia. Prior to March 1942, this land was undeveloped low-lying marshland which was flooded at high water on the river and was unsuitable for industrial use until filled in. It had a value as of March 1942 as unimproved waterfront property of $500.00 per acre, or a total value of $53,550.00.
2. Prior to March 1, 1942, the United States Maritime Commission, an agency of the United States, had acquired lands adjacent to plaintiff’s waterfront property described in Finding 1, and had constructed thereon a shipyard which was operated by the Southeastern Shipbuilding Corporation..
3. On March 1,1942, the United States Maritime Commission entered into a contract with plaintiff known as Contract No. Mcc-2646 under which plaintiff leased said 107.1 acres of land to defendant for a term of five years, at an annual rental of $4,200.00, with right of renewal and with right to terminate by 60 days’ notice in writing. Defendant, by letter dated March 11, 1947, acknowledged by plaintiff on March 23, 1947, exercised the option contained in Article VIII of the lease and renewed the lease for an additional term of five years ending February 29,1952.
4. Article II of the lease provided that the defendant-lessee could make such improvements on the leased land “as may be necessary for the construction of a complete shipyard” and that plaintiff-lessor would “not make or assert any claim * * * on account of any damage or injury to the leased premises on account of any work performed under or in connection with” the construction of its shipyard or its use after construction. Article III provided that title to all property whether or not affixed to the soil shall be and remain in the defendant-lessee with right to remove at will; that defendant-lessee shall have 90 days after termination of its lease to remove “any of the aforementioned facilities”; and further
The Lessor further agrees that it will not make or assert any claim on account of damage or injury of whatsoever nature caused to the leased premises by any act or omission of the Lessee or any of its agents, employees, or independent contractor employed by it in connection with the removal from the leased premises of any facilities, structures, buildings, or other property of whatso *143 ever nature. The leased premises, however, from which any facilities are removed, shall be restored to as good a condition as they were prior to the acquisition, construction, or installation of such facilities.
Article IX provided that defendant-lessee shall take the leased property “in its present condition without any duty or obligation upon the lessor to perform any act or to do anything to make said premises usable or suitable for the purposes or objects of the lessee” and shall at its “own cost and expense make any ordinary and usual grading necessary to make the property usable for its purposes.” By Article XI, defendant-lessee agreed, upon expiration of the lease, to “surrender and deliver up said premises to the lessor herein without let or hindrance and in accordance with the tenor of this agreement.”
5. Shortly after execution of the contract of lease, the defendant, acting through the United States Maritime Commission and its contractor, the Southeastern Shipbuilding Corporation, entered upon the premises and constructed a large so-called wet dock or fitting-out dock and shops, warehouses, and other buildings and facilities on said dock or wet-dock addition and other portions of the premises, together with crane tracks and railroad tracks on, to, and from the dock; dredged the river to make it navigable for use in connection with the facilities so constructed, and deposited the dredged soil upon some 70 acres of the leased premises to a height slightly in excess of high tide; and constructed roadways, walks, etc., thereon for ingress and egress to and from the premises, the dock, and other structures. The defendant expended $1,836,275.92 in preparing the site and constructing the railroad tracks, roadways, and buildings and utilities above and below the ground, of which $370,029.68 were expended below the ground and $1,466,-246.24 above the ground. The wet dock was approximately 1,800 feet long and 40 feet wide. Immediately back of the wet dock and a part thereof was the wet-dock addition on which were placed various structures. These structures were built on some 6,500 to 7,100 untreated pine piling, on which was placed 12 x 14 caps and on top of the caps 3 x 12 timber bolted with 1-inch bolts and topped with 3 x 12 boards, all of said materials being untreated. Buildings occupied about *144 15% percent of the wet dock and addition. The crane rail and railroad tracks were constructed on and along the wet dock under which the pilings were placed much closer together than they were under other parts of the wet dock because of the increased load. Behind the dock and on the land area other structures were built, some with concrete-slab floors, others with concrete floors erected on untreated piling; also some reinforced concrete platens supported by untreated piling which were covered by steel plates on which material was handled, stored, and fabricated. The platens consisted of reinforced concrete on 10-inch piling and were approximately 2 feet thick and 60 feet in length with 10-foot centerpieces of like width and thickness. Each weighed approximately 13 tons. Untreated pine piling has an indefinite life below the waterline; but, above the high-water mark, due to constant exposure to the air, and between the high-, and low-water marks, due to twice daily exposure to the air as a result of the rise and fall of the tide, such piling has a. life of only 4 to 10 years. Although permanent docks are usually built of treated pine piling, the piling below low tide is still in sound condition and will remain so indefinitely.
6. The specific items of improvements constructed by the defendant and the costs are as follows:

*145 7. Except for the outfitting shop and one or two smaller structures which were placed on the wet dock or the wet-dock addition, all of the other buildings and the roads, including the railroad, constructed by the defendant, were placed upon the land area which had been filled. The buildings were built on concrete slabs which were placed directly on the ground, except in a few instances in which the concrete floors were placed on pilings which had been driven into the filled area.
8. In March 1948 plaintiff notified the War Assets Administration, which had taken over the properties for defendant, that plaintiff would not be interested in acquiring the facilities and would “expect War Assets Administration or any individual or firm to whom buildings or other facilities located on the premises are sold to restore property to as good a condition as it was prior to the acquisition, construction or installation of such facilities, including the removal of any and all concrete floors or foundations.” By letter dated May 21, 1948, War Assets Administration notified plaintiff that “a contract has been let for the removal of all improvements placed on the premises by the Government” and “The United States of America exercises the right reserved in said lease and will quit, relinquish and give up said premises effective midnight July 31,1948.”
9. As of May 10, 1948, two weeks prior to said notice of cancellation, War Assets Administration had entered into a contract with Industrial Salvage Corporation under which, in consideration of the sum of $50,000.00, the Government sold to Industrial Salvage Corporation buildings and improvements aggregating 33 items. These items were listed in a Schedule A, a copy of which is attached to plaintiff’s petition. Under paragraph 4 of said agreement, the purchaser agreed to “completely remove said buildings and fixtures and clean up the site of the buildings to the satisfaction of the Deputy Regional Director for Beal Property Disposal.” Said corporation did not complete its contract within the period of the lease, and plaintiff and defendant entered into a supplemental lease under date of February 17, 1949 revoking said notice of cancellation referred to in Finding 8 hereof and extending the lease to midnight Octo *146 ber 31’, 194£j. Under Article III of the lease, defendant had “ninety (90) days after the termination thereof for the purpose of removing any of the aforementioned facilities, including all buildings and improvements * *
All of the buildings were removed, but concrete floors, piling foundations of a number of the buildings, the piling and partially dismantled structure of the docks along the waterfront and a number of concrete platens were not removed. Photographs of various sections of the premises introduced in evidence show the piling above low tide and dock superstructure in a deteriorated condition and the state of disrepair of portions of the premises as left by the defendant. The surface of the wet dock and addition was almost completely destroyed, with protruding timbers and decking strewn throughout its length of 1,800 feet.
10. On May 2, 1950, plaintiff filed a claim with the General Service Administration containing a detailed statement of the basis therefor with photographs of the premises and demanding the restoration of the premises by the removal of the obstructions indicated or, in the alternative, payment to plaintiff of its estimated cost of $142,650.00 to restore portions of the premises as follows:

Plaintiff’s claim was referred to the Comptroller General, who rejected it under date of September 5, 1950 (Symbols B-97172).
11. The costs as set forth by the plaintiff for removing the items listed in Finding 10 above are 10 percent in excess of the plaintiff’s actual estimated costs, and that 10 percent was added for what the plaintiff’s witnesses considered to be “contingencies.”
*147 The costs as estimated by the plaintiff made no allowance for and did not take into consideration the salvage value of any of the material which it contends required removal.
12. The plaintiff does not seek complete restoration of the premises but seeks restoration by removal of only those items placed upon the premises by the Government which the plaintiff considers are detrimental. For example, the plaintiff does not seek compensation for the cost of removing the fill or the removal of the roadways and railroad bed placed upon the land by the defendant. These additions or improvements made by defendant enhanced the value of the property, not only for the use desired by defendant at the time but also for any future use of the site by the plaintiff-owner.
13. In March 1942, when the premises were leased by the defendant, the 107.1 acres of land were low-lying marshlands generally unsuited for anything except future development by filling and improvement.
The fair market value of the premises for their highest and best use in March 1942 was $500.00 per acre, or a total of $53,550.00.
14. The development of the site by the defendant included the placing of approximately 900,000 cubic yards of fill upon the premises, which resulted in raising the elevation of 70 acres of the 107.1 acres of low-lying marshland an average of 8 feet. The presence of the fill thus made the land more valuable for any purpose and usable for industrial purposes for which it was particularly adaptable.
15. In January 1949, with all detrimental facilities removed, the fair market value of the 70 acres of land which had been filled by the defendant would have been $1,500 per acre for their highest and best use.
16. In January 1949, with all facilities which the plaintiff claims to be detrimental removed, but with the fill in place, the fair value of the property would have been $123,500.00. At that time the fair and reasonable cost of removing those facilities or improvements which were detrimental would have been $86,960.
17. It is not definitely established by the evidence that there was any material appreciation in unimproved indus *148 trial property in or near Savannah between 1942 and 1949. Therefore, had the premises remained entirely unchanged by any fill or construction, their fair market value in January 1949 would have been the same as in 1942; namely, $500 per acre, or $58,550 for their highest and best use.
18. The concrete slabs and flooring and the concrete foundations which remained on the premises could be removed by blasting, by a dragline, or by dropped weights. The use of air tools would be necessary for the removal of the heavier concrete. It may be removed by blasting and then by air tools and torches for cutting the steel reinforcements. The concrete rubble then could be spread out by use of a bulldozer and covered with earth or could be removed by loading and hauling away, which would be more expensive.
19. While the presence of the concrete slabs and platens would interfere with the use of the premises in the future for some purposes, those structures could be utilized as floors or foundations for buildings which could be erected upon them. The existing piling could be utilized for the foundation of a new dock at any time within the next 5 or 10 years.
20.- The remains of the dock structure, which consisted of approximately 6,500 pilings and 750,000 f. b. m. of crossbeams, capping, and other timber, could be removed by the use of a skid rig. The rig could be placed upon the dry land and cables placed around the pilings. The power obtained from the use of such an engine should be sufficient to pull the pilings and the remaining timbers which were attached.
21. The piles, when handled by the process outlined in Finding 20, would either be pulled out completely or break off from 12 to 20 feet below the river bottom and at the marl line. The marl is the hard layer of gravel or rock which in the Savannah area is found about 12 to 20 feet below the soft mud and silt on the river bottom. It is not established by the evidence that the remains of the piles below the marl line would prevent the construction of new docks. The new pilings could be driven into or between the remains of the old pilings.
*149 22. Another method could be utilized to remove the pilings. They could be removed by sawing them off at the river-bottom level. A new dock could then be constructed by using the old piles as a base and encasing them in concrete, which would form a solid, compact, or “composite pile.”
23. Since the construction of the dock in 1942, the piling has rotted to some extent above the average low-tide level. In the particular location of the piling in the Savannah River, several miles from the ocean, there are no harmful marine animals or plants which cause rot or deterioration below the average low-tide line. The piles have rotted only where they have been alternately exposed to the air and submerged in the water by the action of the tides. Therefore, the piles are sound below the surface of the river, and both plaintiff and defendant agree that they will remain sound and useful for an indefinite time.
24. When pulled, broken, or sawed, the piling could be disposed of by spraying with fuel oil and burning on the premises or by loading on a barge and hauling away to a suitable location for burning, or other disposition.
25. In January 1949, the fair and reasonable costs of removing those Government-constructed improvements remaining on the premises which the plaintiff considers detrimental to the free use of the property were:
Bemove concrete building foundations (980 cubic yards, at $12)-$11,760
Remove platen foundations (770 cubic yards, at $15)_:_ 11,550
Bemove rotten dock superstructure (450 M b. m., at $25)_ 11,250
Bemove piling_ 52,400
Total cost of restoration of items claimed by plaintiff (exclusive of fill)_ 86,960
26.The testimony is conflicting with respect to the value of recoverable salvage to be realized in the removal and disposition of improvements placed upon the property by the defendant. The record is not adequate for the purpose of definitely establishing the amount, if any, which could be realized from this source.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *150 of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States eighty-six thousand nine hundred sixty dollars ($86,960.00).