RIVERSIDE COUNTY, CALIFORNIA

v.

The UNITED STATES.

No. Cong. 1–53.

United States Court of Claims.
Jan. 31, 1956.

Ray T. Sullivan, Jr., Riverside, Cal., and Robert F. Klepinger, Washington, D. C., for plaintiff.

Herbert Pittle, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LIT-TLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This case comes before the court pursuant to House Resolution 215, 83d Congress, 1st Session, adopted May 19, 1953, which provides as follows:

"*Resolved,* That the bill (H.R. 2294) entitled 'A bill for the relief of the County of Riverside, California', together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

Plaintiff, a county of the State of California, on or about August 13, 1940, purchased 318½ contiguous acres of land within the county. The total purchase price amounted to $17,800. The purpose was to make the site available for training Air Corps pilots by the Ryan School of Aeronautics (Ryan).

On August 26, 1940, plaintiff leased the 318½ acres to Ryan for an annual rental of $500. The purpose of the lease was stated as follows:

"Whereas, the Lessee desires to lease and use said property for the purpose of constructing and maintaining all necessary facilities for training purposes in connection with the aircraft industry and for the purpose of training by the Lessee of aircraft pilots and technicians, both private and for the United States Government, or any agency thereof, as well as for manufacturing processes and housing and messing. facilities and public canteen, all in connection with and incidental to the aircraft industry."

Among other things, the lease required the plaintiff to clear the site and apply oil to 3 million square feet of the area.

By the terms of the contract Ryan was obligated to construct, within six months following the execution of the lease, improvements worth not less than $50,000 and to maintain such improvements at or above that minimal value throughout the first five years of the lease,[1] in default of which Ryan was to pay specified damages to the county. It was agreed that these improvements should constitute the personal property of Ryan, removable at its pleasure, with the proviso, however, that plaintiff might not, without payment of damages, reduce the total value of such improvements below $50,000 during the first five years of the lease.[2] The lease was for a 5-year term, renewable at the option of Ryan for three additional 5-year terms. Ryan also had an option to purchase the property with all its improvements at any time for $35,000.

Plaintiff expended $15,965 to accomplish the work it was required to do under the lease. Plaintiff removed obstructions, did some grading and applied oil. The original landing area constructed by

---

1. The provisions of the lease are somewhat contradictory as to the period during which Ryan was to maintain the value of its improvements at ˙or above $50,000. One clause says five years after

the execution of the lease and another provides for five years after ᵗhe completion of improvements worth $50,000.

2. See Note 1 above.

plaintiff encompassed 2,828,943 square feet. Ryan made extensive improvements, such as erecting buildings, sinking wells and laying sewers. With the written consent of plaintiff, Ryan, on February 25, 1942, conveyed all its interest under the lease to the Defense Plant Corporation (DPC), a corporation indirectly owned by the United States. DPC then leased the facilities back to Ryan.

DPC made further improvements upon the property. The landing area was extended and resurfaced at the cost of over $100,000. The United States acquired by purchase an additional 71.77 acres adjacent to plaintiff's property. More buildings were erected. Existing structures were improved. By October 1943 DPC had spent almost $450,000 on improvements to plaintiff's property and the adjacent 71.77 acres.

The field was used by Ryan both before and after the assignment for instructing Army aviation cadets under an arrangement between Ryan and the Army Air Corps. The planes then using the field were light training planes not heavier than 3,000 pounds. About January 1, 1945, the training operations ceased. The landing mat was in good shape throughout this time.

On March 31, 1945, the DPC gave permission to the United States Marine Corps to use the field for carrier practice landings. The Marine Corps occupied the field for this purpose for the next seven months. During this period heavy planes with powerful slipstreams were landing on the field, causing it serious damage. After the Marine Corps left, the premises were used for the disposal of surplus military property. The landing mat received no further maintenance by the Marine Corps or the Reconstruction Finance Corporation, successor to DPC, after November 1, 1945.

At various times after the Marine Corps operations had damaged the mat, estimates were made of the cost of repairing it. These estimates varied widely. Since they were made at different stages of the field's deterioration, at un-equal price levels, and were based on varying assumptions as to the amount of work to be undertaken, they are not truly comparable. At the time the field was returned to the plaintiff the landing mat could have been restored to a good and serviceable condition for $110,090. After this expenditure the landing mat would have been as good as and probably better than the original mat.

On October 21, 1946, the County of Riverside submitted an application to the Government for the conveyance to the county of all the Government's rights and interest in the field. The county renewed its request by letter dated March 24, 1947. After some further negotiations defendant executed a quitclaim deed, dated June 4, 1948, by which it surrendered its leasehold and granted the adjoining 71.77 acres plus all improvements on both parcels to plaintiff. The quitclaim deed released the United States from all claims of liability for restoration of the property provided that such release should not be construed as depriving plaintiff of any rights it might have to receive reimbursement under section 17 of the Federal Airport Act, 60 Stat. 170, 179, 49 U.S.C.A. § 1116.

In June 1948 the highest and best use of the entire property (the original 318½ acres and the 71.77 acres added later) together with the buildings and other facilities, was for airport purposes. At that time the fair market value of the entire property was $250,000 for its highest and best use. The fair market value of the 71.77 acres was then $10,000, and of the improvements on that tract $30,000. The fair market value of the improvements on the 318½ acre tract was $174,000 in June 1948.

Since 1946 plaintiff has repeatedly attempted to have the United States Government make the needed repairs to the landing mat, or to pay for such repairs. These efforts did not meet with success. In 1950 plaintiff submitted its request for reimbursement under section 17 of the Federal Airport Act, *supra*, to the Civil Aeronautics Administration. The

latter agency rejected the application on the ground that the airport was not a public airport at or prior to the time the United States entered occupancy. This decision was reaffirmed on October 26, 1951.

Plaintiff, in the first place, seeks judgment on its petition and bases its right to recover on section 17 of the Federal Airport Act, as amended, 60 Stat. 170, 179, 62 Stat. 1111, 49 U.S.C.A. § 1116. Defendant interposes a jurisdictional objection but under the view we take of the merits we need not decide the jurisdictional point. As amended in 1948 section 17 provides in part:

"(a) Reimbursement shall be made to public agencies, as provided in this section, for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency. * * *

"(b) Such amount as may be found by the Administrator to be the actual or estimated cost of such rehabilitation or repair shall be certified by the Administrator to Congress, * * *. Certifications made hereunder by the Administrator shall be deemed contractual obligations of the United States, payable as hereinafter provided."

"Public airport" is defined in section 2 of the original act as:

" * * * any airport which is used or to be used for public pur-

poses, under the control of a public agency, the landing area of which is publicly owned."

It is defendant's position that while plaintiff's airport may have become a public airport within the definition after the Government returned the property to the county, the property did not fall under the definition prior to that time. Defendant concludes that section 17 precludes plaintiff's recovery if that is the case. Specifically, defendant cites certain regulations (14 C.F.R. 560.5 (1949 Ed.)) issued by the Administrator of the Civil Aeronautics Administration which provide, in part:

"§ 560.5 *Eligible airports.* (a) To be eligible an airport must meet the following requirements:

\*         \*         \*         \*         \*

"(3) The airport. * * * must have been used for public purposes, under the control of a public agency, at the time the damage occurred." [3]

Plaintiff contends that the property has been a public airport right along. The issue between the parties on this phase of the case comes to this: whether the property was a public airport prior to its return by the Government, and, if not, whether it nevertheless qualifies under section 17.

The legislative history of section 17 does not give much help in solving the problem.[4] The act as a whole

---

3. The regulation was revised in 1953. The corresponding provision of the revised regulations is substantially the same and reads:

"§ 560.5 *Eligible airport.* To be eligible, an airport must * * * meet the following requirements:

"(a) * * * and the airport * * * must have been used for public purposes under the control of a public agency at the time the damage occurred * * *."

4. Section 17 (or its equivalent) of the original statute passed in 1946 was discussed briefly in a Senate Committee Report and in a House Conference Report of that Congress. Senate Report 224, 79th Congress, 1st Session, ex-

plains, at page 6, that section 17 (or its then equivalent)

" * * * sets up a method for reimbursement for damage to public airports resulting from use by the Army or Navy * * *."

House Report 1828, 79th Congress, 2d Session, elucidates the purpose of section 17 in a passage on page 20 from which we quote this part:

"By section 17 of the conference substitute the Administrator of Civil Aeronautics is authorized to consider, ascertain, adjust, and determine any claim submitted by a public agency for reimbursement of the cost of necessary rehabilitation or repair of a public airport, under control or management of such pub-

contemplated the construction of a system of public airports by giving local governments financial aid from the Federal Treasury for this purpose. Section 17 appears to have been designed for the quite different purpose of compensating local governments when their airports were damaged by Federal agencies. The statute uses the words "rehabilitation or repair of public airports", words which suggest a return to a former state. This implies, therefore, that there must have been a public airport in the past which, due to the action of a Federal agency, was somehow damaged. We do not think that the statute intended to allow compensation for rehabilitating all airport property damaged by a Federal agency, even where such property was later used as a public airport. It is clear that the mere fact that a public agency owned a reversionary interest in an otherwise private airport would not entitle it to compensation under section 17 for damages to the airport.

Perhaps the property in question was a public airport within the meaning of the act before plaintiff leased the land, though we have doubts on that score since it was not then actually an airport. But by the time the Federal Government damaged the field at least one of the elements of the definition was lacking. The DPC was then the assignee of the lease Ryan had made with plaintiff. Under the lease the lessee could extend the lease for three additional 5-year terms or buy up the whole property outright at any time. The lessee could use the airport for its purposes, no reservation having been made by which plaintiff could force its use for plaintiff's pur-

poses. Realistically plaintiff had no control over the airport under the terms of the lease. Moreover, we doubt that a lease for the exclusive use of a private aircraft corporation can be deemed to be a "public purpose" within the meaning of section 17. Undoubtedly plaintiff expected the field to be used by Ryan primarily for training military pilots. Nonetheless, the lease, as can be seen from the preamble quoted above, gave Ryan much greater freedom in utilization of the field. We do not decide whether or not the lease to Ryan was for a public purpose within the meaning of the constitution and laws of the State of California. What is a public purpose under those laws may well not be a public purpose under the Federal statute.

■■ We must conclude, therefore, that the act intended to compensate for damage to public airports only where they were public airports at the time of or immediately prior to their use by the Federal Government. The plaintiff's airport was not a public airport when the Government took over the field nor when the damage occurred. Hence, the plaintiff cannot recover under section 17. Since the quitclaim deed released the Government from any liability other than that imposed by section 17, we conclude that plaintiff has no legal claim against the Government.

Prior to giving the release plaintiff may have had a legal claim for damage to the improvements that were made by plaintiff itself. Atlantic Coast Line Railroad Co. v. United States, 129 Ct.Cl. 137. The record does not indicate how much plaintiff's expectations of receiving compensation under the Federal Airport

---

lic agency, substantially damaged by any Federal agency."

The only committee report made upon the 1948 amendment to section 17 was House Report 2307, 80th Congress, 2d Session, which stated, in part:

"The following letter from the Secretary of Commerce fully explains the bill and sets forth the reasons why it should be promptly enacted into law.

\*　　\*　　\*　　\*　　\*　　\*

"The legislative history of section 17 of the Federal Airport Act indicates that it was the intent of the Congress that municipalities whose airports were damaged by Federal agencies, particularly in connection with military operations during the war, were entitled to have such airports restored to their former condition at the cost of the Federal Government."

The debates do not shed any further light on the matter.

Act, supra, influenced it in releasing its claims. Plaintiff had reason to feel that the Marine Corps' use of the field was different from anything contemplated by plaintiff when it leased the field. All the same, plaintiff may well have decided to release its claim anyway in order to get what the Government was offering.

Plaintiff's legal position was, after all, not too strong. True, it had the right to receive all the lessee's improvements that the defendant chose not to remove. But the Government could freely remove all improvements that were not put in by plaintiff itself; it still had over 12 years' tenancy rights in the leasehold; and, also, it could buy up the whole 318½ acres with all improvements for $35,000. It could hardly be thought that the Government would spend more than $35,000 to repair someone else's field (save it were impelled by motives of some other public policy) when it could purchase the whole field for $35,000.

The value of the improvements on plaintiff's 318½ acres was $174,000 in 1948. Plaintiff had spent $15,965 on improvements in 1940. The record does not disclose what value these original improvements would have had in 1948. Undoubtedly any increase due to inflation was partly offset by normal depreciation. But even if we allow a generous amount for the value of plaintiff's improvements in 1948, we still must conclude that the value of all other improvements, none of which were made at plaintiff's expense and all of which were given to plaintiff, greatly exceeded the sum needed to repair the landing mat in 1948. In addition the United States gave plaintiff 71.77 acres with all improvements thereon, constituting an additional value of $40,000.

██ The plaintiff asserts that some parts of the property it did not want and could not use, and that the most essential installation of the airport, its landing mat, was in need of major repairs. The evidence shows, however that hangars and other valuable improvements were being utilized by plaintiff at the time the testimony was taken. In view of all the circumstances, we cannot escape the conclusion that the plaintiff received far greater value both in the improvements and the gift of 71.77 acres of land than the total amount it had invested in the property, and that the equities therefore are not in its favor.

We find that the plaintiff has no legal or equitable claim against the United States.

This opinion and the findings of fact, with the conclusions therein, will be certified to the Congress pursuant to House Resolution 215, 83d Congress, 1st Session.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.