**REALTY ASSOCIATES, Inc.,**
a corporation,

v.

**The UNITED STATES.**

No. 582–52.

United States Court of Claims.
March 6, 1956.

Russell Morton Brown, Washington, D. C., for plaintiff. Robert T. Murphy, Washington, D. C., was on the briefs.

Herbert Pittle, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for the defendant.

JONES, Chief Judge.

Plaintiff seeks to recover the cost of restoring certain property which had been leased to the Government by the plaintiff's predecessor in title. The lease covered several buildings and 12.3 acres of ground.

Some of the buildings in question were constructed in 1886 and others in 1901. They were built originally, and prior to 1934 had been used solely, for the cotton milling industry. Gradually over the years this industry migrated toward the cotton-producing area. This movement was accentuated by the depression.

The buildings became idle in 1934 and the textile machinery was removed. The buildings remained idle until the Government rented them in 1943.

In December 1942 the then owner sold all the buildings and approximately 50 acres of ground to Edward A. McNulty for the sum of $65,000.

Early in 1943 the defendant began condemnation proceedings but at the instance of the owner accepted a lease contract by the terms of which the defendant contracted to pay the owner an annual rental of $25,000.

Pursuant to permission granted by the terms of the lease the Government spent more than $558,000 in modernizing, building approaches, improving, adding one new building, and building access roads.

On February 28, 1946, McNulty sold the buildings and 12.3 acres of the land to the plaintiff for $307,500.

The defendant paid the annual rental until January 31, 1947, when the lease was terminated.

At the time of the trial the plaintiff was leasing the premises to various tenants for an annual rental of $150,000.

It is almost a rags-to-riches story.

But, says the plaintiff, since the lease contract stipulates that the defendant was obligated to restore the premises to the same condition that existed at the beginning of the lease, and that, having failed to do so, plaintiff is entitled to recover the cost of such restoration.

The defendant contends that the plaintiff suffered no damage because the value of the property at the time it relinquished possession to the plaintiff was greater than that which existed at the time of the original lease by reason of the substantial improvements which had been made to the property as a whole during the defendant's tenancy. It also contends that the cost of restoration, in the facts of this case, is not the true measure of damages.

Since the termination of the Government's lease the plaintiff has leased portions of the premises to a number of different tenants engaged in various light industries such as weaving, dyeing, bleaching, paper manufacturing, and steel fabricating. Other portions of the premises have been leased for storage. The premises are now 100 percent rented and produce a gross return of $150,000 per annum in their present unrestored condition. All in all, the property has been made much more valuable by the defendant's alterations. It would be a financial tragedy for plaintiff if the premises were actually restored to their 1943 condition.

The plaintiff contends that all that is irrelevant, that defendant cannot set off improvements in order to escape its obligation to restore.

Ordinarily this is true. Generally speaking the cost of restoring is the measure of damages, taking into consideration the age of the installations and ordinary wear and tear.

But this is not a suit for specific performance. It is a suit for breach of contract. Plaintiff is entitled to whatever damages were caused by the failure to restore. Crystal Concrete Corp. v. Town of Braintree, 309 Mass. 463, 35 N.E.2d 672, 675. If the defendant had restored the premises to the ancient, inaccessible and largely unusable condition that existed in May 1943 no one would have been more unhappy than plaintiff.

The instant case is distinguishable from the Atlantic Coast Line Railroad Co. case, Atlantic Coast Line R. Co. v. United States, 129 Ct.Cl. 137, on which plaintiff relies. In that case the defendant had left concrete building foundations and concrete slabs on the premises which actually lessened the value of the land. The defendant in effect conceded the actual damage to the land by virtue of the rubbish and foundations that were left thereon but sought to offset this damage by a claim that the value of the improvements in the way of the filling and building up of the land equalled the impairment in value by the failure of the defendant to otherwise restore the land, and that in this way the condition of the lease had been satisfied. All that the Atlantic Coast Line case holds is that the value of other improvements cannot be used to offset actual damage to the property which was caused by the defendant's breach in its failure to remove the concrete foundations, slabs, and other obstructions left on the property.

In the case at bar nothing that defendant did in improving the premises actually damaged the property. Everything it did increased the value of the property.

Conceding that according to the Atlantic Coast Line case the more than one-half million dollars of improvements placed upon the property by the defendant could not as such be offset against any damage which the defendant's acts may have occasioned the property, this does not relieve plaintiff in a suit for breach of contract from showing that he actually suffered damage by virtue of the breach.

If this were a suit for specific performance, the plaintiff might well compel the defendant to actually restore the property to the status and condition which prevailed in May 1943, upon the performance of which the property would again become practically useless. I am sure the plaintiff would not have thought of instituting such a suit because it is inconceivable that it would have wanted the property restored to its previous condition which had produced years of idleness. In the light of the entire record it is difficult to believe that plaintiff in good faith wanted any of the items restored.

To hold that in spite of the vast increase in the value of the property and the lack of damage caused by any action of the defendant, the plaintiff nevertheless is entitled to recover in addition to the mythical cost of restoring the property is inconceivable. To hold that the technical wording of the lease would justify an award of $220,000, or anything like that amount in damages which are practically nonexistent, runs counter to every tenet of justice and fair play which we have known from our youth up.

Plaintiff takes a simple technical wording of a lease, carries it along the road to a pure legalism, and from there on to an absurdity. Somewhere along the way the spirit of the law is lost, falls into a dreamless sleep, and lies in an unmarked spot.

The property had been completely idle for nine years because of its special character, its age, the shift in the textile industry, the inaccessibility of the property, and its not then being in form suitable for other uses.

The various actions taken by the defendant in improving and modernizing the property, making it accessible and fitting it into the current needs of the locality, together with the exercise of imagination and business acumen of the plaintiff, have transformed the proper-

ty from a state of idleness into a prosperous holding which is producing regular and substantial income.

■ We cannot see where plaintiff has been substantially damaged. Mark Twain once said that the difference between a dog and a man is that if you pick up a starving dog and make him prosperous he will not bite you. We suppose it is as natural for a human institution to look after its own interests as it is for the sparks to fly upward, but in order to justify recovery in this case the plaintiff must show actual damages by virtue of the breach of the contract which, in our judgment, it has not shown.

There are one or two items on which, if the plaintiff had introduced proper evidence, recovery should have been permitted. The iron picket fence, while practically useless where it was, must have some market or at least salvage value but the record is completely silent as to any such value, or even as to what became of the fence after it was taken down. The only evidence in the record is what it would cost to put up an entirely new picket fence of this type. In the circumstances of this case that is not the proper measure of damages and we have no evidence upon which to base a reasonable judgment as to the market or salvage value of the fence. The same is true of the foot bridges. No substantial damages caused by the failure to restore these items have been shown. The cost of transporting an old iron fence and the lack of a ready market for such material would probably leave only a salvage value which would be very little above the cost of transporting, handling, and disposition. To have restored the foot bridges would not only have been of no value, but they would have been in the way and would actually have damaged the property in view of its improvements and the roadways that had been placed around the property. The storm sash, the age and condition of which were not shown, were no longer needed in view of the changed use of the property.

The relocation of the railroad siding, which constituted a substantial benefit to the use to which the property is now being put, is inextricably tied into the item of the retaining wall to support the bank to the east of the buildings for which the plaintiff has claimed $43,000. Although that bank is somewhat sharper in angle than it had been, there does not appear to be any real danger from erosion as claimed by the plaintiff. This is clearly indicated by the photographs in evidence.

Further, the access road around the storehouse, which was not in existence at the beginning of the tenancy and which was made possible by the removal of the bank, is of great value in the use of all of the buildings.

The floors were of more substantial value but even so they were too close together and unsuited to the present uses of the property. Again the measure of damages for a breach is not necessarily the cost of restoring the property but the actual damage to the property by the failure to restore. Frequently the easiest measure of damages to apply is the cost of restoration which very often is less than the actual damage to the property by virtue of the failure to restore. But when all of the evidence in this case is considered, we think that the damage to the property by the removal of the floors was very slight if there was any damage at all.

■ The plaintiff in oral argument says that the action by the defendant, apart from the provisions in the lease, would constitute waste, and this is true. But the rule for the measurement of damages in an action for waste is the diminution in market value resulting from such waste. If we apply this measure of damages to this case with respect to the pickerhouse and the storehouse, together with the two connecting bridges, based upon the findings of the commissioner, the plaintiff would be entitled to recover only $12,000. This is the amount which we have found from the evidence to be the difference in value of the buildings in 1947 with and

without the floors and bridges. Under all the facts of this case this would appear to be ample to compensate the plaintiff, the successor lessor, who purchased the property after the waste had been committed, who knew the extent thereof, and who probably had a pretty good idea that such floors and bridges would not be rebuilt at the termination of the Government's tenancy.

As to the storm sash, the evidence of the value that would have been added to the buildings in 1947 had the storm sash been restored is meager. Plaintiff was offered full opportunity to prove the value of such sash, but preferred to stand on the cost of replacing them, and offered no other proof. But considering the evidence as a whole, including the condition and apparent age of the sash as indicated by the exhibits in evidence, the lack of need for them in view of the changed use of the building, the additional wear and tear that probably would have occurred during the four intervening years, and other circumstances shown in the record, we find that the increased value would not have exceeded $5,000.

In the record is a modification agreement dated January 31, 1947, the last day of the defendant's tenancy, which, by reason of the surrender of portions of the premises, reduced the rental rate from $25,000 per annum to $17,843.50 per annum for the month of November 1946, and further reduced the rental to $14,177.25 per annum for the months of December 1946 and January 1947. This agreement was dated subsequent to those referred to in finding 23 and omitted any reference to reimbursement of the defendant for the cost of services of heat, light, power, water, etc. By converting the above rates to monthly rates, the rental payable by the defendant for November 1946 was $1,486.96, and for December 1946 and January 1947 the rental for each month was $1,181.44, making a total of $3,849.84 due the plaintiff for unpaid rent.

Plaintiff is entitled to a judgment for $20,849.84.

It is so ordered.

LARAMORE, WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

Our case involves the legal obligations of a tenant who has leased property by a lease containing a covenant to restore the property, at the end of the lease, to the same condition as at the beginning, ordinary wear and tear excepted. I think the lessor may not be left in the position where, in order to have the use of the same facilities which he had before the beginning of the lease, he must spend his own money to reconstruct them. For example, in the instant case, there were in place, at the beginning of the lease, 450 storm sash on the large windows of the main factory building. The United States during its tenancy, discarded 375 of these storm sash. The cost of replacing them would have been more than $27,000. The judgment of the court gives the plaintiff $5,000 for the destruction of this property. Whether this means that the court has concluded that the placing of storm sash on these windows would be practically useless, an almost total economic waste, we are not told. There is no evidence upon which the court could have based such a conclusion. Nothing that we judicially know about New England winters or the price of fuel would justify such a conclusion.

If it be urged that the plaintiff should recover, not the cost of new storm windows, but the value of the old ones when the Government destroyed them, and that the plaintiff did not offer evidence of that value, I think that position is not well taken. The storm sash were in place and in usable condition at the beginning of the tenancy. Their second-hand value would have been substantially zero. The Government destroyed them, so that it cannot replace them. It will cost the plaintiff $27,000 to have storm windows

usable and in place. I know of no other way to fairly measure the plaintiff's damage. I think my tenant cannot put me in the position where if I take a little of his money and add to it a lot more of my own money I can again have a front door or storm windows on my house. If my old front door or storm windows have to be replaced by costly new ones, that is a result which the tenant could have avoided by not destroying my old ones.

I think the evidence leaves no room for doubt that if the floors in the pickerhouse and the storehouse were in place, as they were at the beginning of the tenancy, the rental value of those buildings would be substantially increased. All the floor space available has been in good demand at profitable rates of rent. But instead of awarding the plaintiff the amount, something over $100,000, that it would cost to replace the floors, the court has awarded $12,000.

One of the Government's experts, Mr. Drew, testified that these buildings were worth as much with the floors out as with the floors in. This testimony was given in the face of the fact that the removal of the floors reduced the floor space in the storehouse from 30,000 square feet to 7,500 square feet, and in the pickerhouse from 16,272 square feet, in addition to the basement, to 8,100 square feet. Space in the building where there were several floors was renting readily at prices averaging about 35 cents per square foot per year.

The Government's other expert, Mr. Scrivner, testified that each of these buildings would have been worth about $6,000 more with the floors in than they were with the floors out. But the difference in rents in a single year would come close to the $12,000 difference in capital value to which he testified.

What the court has really done, it seems to me, is to set off the improvements which the Government has made in the plaintiff's property against the gaps which have been left by the failure to restore. The court has not been consistent in doing this, or it would not have awarded the plaintiff anything at all. One must concede that there is a certain rough justice in this process of setoff. My objection to it is that I think it is not the law.