Jones, Chief Judge,
delivered the opinion of the court:
This case comes before the court pursuant to House Resolution 215, 83d Congress, 1st Session, adopted May 19,1953, which provides as follows:
Resolved, That the bill (H. R. 2294) entitled “A bill for the relief of the County of Riverside, California”, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
Plaintiff, a county of the State of California, on or about August 13, 1940, purchased 318% contiguous acres of land within the county. The total purchase price amounted to $17,800. The purpose was to make the site available for training Air Corps pilots by the Ryan School of Aeronautics (Ryan).
On August 26, 1940, plaintiff leased the 318% acres to Ryan for an annual rental of $500. The purpose of the lease was stated as follows:
Whereas, the Lessee desires to lease and use said property for the purpose of constructing and maintaining all necessary facilities for training purposes in connection with the aircraft industry and for the purpose of training by the Lessee of aircraft pilots and technicians, both private and for the United States Government, or any agency thereof, as well as for manufacturing processes and housing and messing facilities and public canteen, all in connection with and incidental to the aircraft industry.
Among other things, the lease required the plaintiff to clear the site and apply oil to 3 million square feet of the area.
By the terms of the contract Ryan was obligated to construct, within six months following the execution of the *664 lease, improvements worth not less than $50,000 and to maintain such improvements at or above that minimal value throughout the first five years of the lease,[1] in default of which Ryan was to pay specified damages to the county. It was agreed that these improvements should constitute the personal property of Ryan, removable at its pleasure, with the proviso, however, that plaintiff might not, without payment of damages, reduce the total value of such improvements below $50,000 during the first five years of the lease.[2] The lease was for a 5-year term, renewable at the option of Ryan for three additional 5-year terms. Ryan also had an option to purchase the property with all its improvements at any time for $35,000.
Plaintiff expended $15,965 to accomplish the work it was required to do under the lease. Plaintiff removed obstructions, did some grading and applied oil. The original landing area constructed by plaintiff encompassed 2,828,943 square feet. Ryan made extensive improvements, such as erecting buildings, sinking wells and laying sewers. With the written consent of plaintiff, Ryan, on February 25, 1942, conveyed all its interest under the lease to the Defense Plant Corporation (DPC), a corporation indirectly owned by the United States. DPC then leased the facilities back to Ryan.
DPC made further improvements upon the property. The landing area was extended and resurfaced at the cost of over $100,000. The United States acquired by purchase an additional 71.77 acres adjacent to plaintiff’s property. More buildings were erected. Existing structures were improved. By October 1943 DPC had spent almost $450,000 on improvements to plaintiff’s property and the adjacent 71.77 acres.
The field was used by Ryan both before and after the assignment for instructing Army aviation cadets under an arrangement between Ryan and the Army Air Corps. The planes then using the field were light training planes not heavier than 3,000 pounds. About January 1,1945, the train *665 ing operations ceased. The landing mat was in good shape throughout this time.
On March 31,1945, the DPC gave permission to the United States Marine Corps to use the field for carrier practice landings. The Marine Corps occupied the field for this purpose for the next seven months. During this period heavy planes with powerful slipstreams were landing on the field, causing it serious damage. After the Marine Corps left, the premises were used for the disposal of surplus military property. The landing mat reecived no further maintenance by the Marine Corps or the Reconstruction Finance Corporation, successor to DPC, after November 1, 1945.
At various times after the Marine Corps operations had damaged the mat, estimates were made of the cost of repairing it. These estimates varied widely. Since they were made at different stages of the field’s deterioration, at unequal price levels, and were based on varying assumptions as to the amount of work to be undertaken, they are not truly comparable. At the time the field was returned to the plaintiff the landing mat could have been restored to a good and serviceable condition for $110,090. After this expenditure the landing mat would have been as good as and probably better than the original mat.
On October 21, 1946, the County of Riverside submitted an application to the Government for the conveyance to the county of all the Government’s rights and interest in the field. The county renewed its request by letter dated March 24, 1947. After some further negotiations defendant executed a quitclaim deed, dated June 4,1948, by which it surrendered its leasehold and granted the adjoining 71.77 acres plus all improvements on both parcels to plaintiff. The quitclaim deed released the United States from all claims of liability for restoration of the property provided that such release should not be construed as depriving plaintiff of any rights it might have to receive reimbursement under section 17 of the Federal Airport Act, 60 Stat. 170, 179.
In June 1948 the highest and best use of the entire property (the original 318% acres and the 71.77 acres added later) together with the buildings and other facilities, was for airport purposes. At that time the fair market value of the *666 entire property was $250,000 for its highest and best use. The fair market value of the 71.77 acres was then $10,000, and of the improvements on that tract $30,000. The fair market value of the improvements on the 318% acre tract was $174,000 in June 1948.
Since 1946 plaintiff has repeatedly attempted to have the United States Government make the needed repairs to the landing mat, or to pay for such repairs. These efforts did not meet with success. In 1950 plaintiff submitted its request for reimbursement under section 17 of the Federal Airport Act, supra, to the Civil Aeronautics Administration. The latter agency rejected the application on the ground that the airport was not a public airport at or prior ta the time the United States entered occupancy. This decision was reaffirmed on October 26,1951.
Plaintiff, in the first plaice, seeks judgment on its petition and bases its right to recover on section 17 of the Federal Airport Act, as amended, 60 Stat. 170, 179, 62 Stat. 1111, 49 U. S. C. 1116 (1952 Ed.). Defendant interposes a jurisdictional objection but under the view we take of the merits we need not decide the jurisdictional point. As amended in 1948 section 17 provides in part:
(a) Reimbursement shall be made to public agencies, as provided in this section, for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency. * * *
(b) Such amount as may be found by the Administrator to be the actual or estimated cost of such rehabilitation or repair shall be certified by the Administrator to Congress, * * *. Certifications made hereunder by the Administrator shall be deemed contractual obligations of the United States, payable as hereinafter provided.
“Public airport” is defined in section 2 of the original act as:
* * * any airport which is used or to be used for public purposes, under the control of a public agency, the landing area of which is publicly owned.
It is defendant’s position that while plaintiff’s airport may have become a public airport within the definition after the Government returned the property to the county, the property did not fall under the definition prior to that time. De *667 fendant concludes that section 17 precludes plaintiff’s recovery if that is the case. Specifically, defendant cites certain regulations (14 C. F. R. 560.5 (1949 Ed.)) issued by the Administrator of the Civil Aeronautics Administration which provide, in part:
§ 560.5 Eligible airports, (a) To be eligible an airport must meet the following requirements:
Jj? 5¡i # }{i ^
(3) The airport * * * must have been used for public purposes, under the control of a public agency, at the time the damage occurred.[3]
Plaintiff contends that the property has been a public airport right along. The issue between the parties on this phase of the case comes to this: whether the property was a public airport, prior to its return by the Government, and, if not, whether it nevertheless qualifies under section 17.
The legislative history of section 17 does not give much help in solving the problem.[4] The act as a whole contem *668 plated the construction of a system of public airports by giving local governments financial aid from the Federal Treasury for this purpose. Section 17 appears to have been designed for the quite different purpose of compensating local governments when their airports were damaged by Federal agencies. The statute uses the words “rehabilitation or repair of public airports”, words which suggest a return to a former state. This implies, therefore, that there must have been a public airport in the past which, due to the action of a Federal agency, was somehow damaged. We do not think that the statute intended to allow compensation for rehabilitating all airport property damaged by a Federal agency, even where such property was later used as a public airport. It is clear that the mere fact that a public agency owned a reversionary interest in an otherwise private airport would not entitle it to compensation under section 17 for damages to the airport.
Perhaps the property in question was a public airport within the meaning of the act before plaintiff leased the land, though we have doubts on that score since it was not then actually an airport. But by the time the Federal Government damaged the field at least one of the elements of the definition was lacking. The DPC was then the assignee of the lease Ryan had made with plaintiff. Under the lease the lessee could extend the lease for three additional 5-year terms or buy up the whole property outright at any time. The lessee could use the airport for its purposes, no reservation having been made by which' plaintiff could force its use for plaintiff’s purposes. Realistically plaintiff had no control over the airport under the terms of the lease. Moreover, we doubt that a lease for the exclusive use of a private aircraft corporation can be deemed to be a “public purpose” within the meaning of section 17. Undoubtedly plaintiff expected the field to be used by Ryan primarily for training military pilots. Nonetheless, the lease, as can be seen from the preamble quoted above, gave Ryan much greater freedom in utilization of the field. We do not decide whether or not the lease to Ryan was for a public purpose within the meaning of the constitution and laws of the State of California. What is a public purpose *669 under those laws may well not be a public purpose under the Federal statute.
We must conclude, therefore, that the act intended to compensate for damage to public airports only where they were public airports at the time of or immediately prior to their use by the Federal Government. The plaintiff’s airport was not a public airport when the Government took over the field nor when the damage occurred. Hence, the plaintiff cannot recover under section IT. Since the quitclaim deed released the Government from any liability other than that imposed by section 17, we conclude that plaintiff has no legal claim against the Government.
Prior to giving the release plaintiff may have had a legal claim for damage to the improvements that were made by plaintiff itself. Atlantic Coast Line Railroad Co. v. United States, 129 C. Cls. 137. The record does not indicate how much plaintiff’s expectations of receiving compensation under the Federal Airport Act, supra, influenced it in releasing its claims. Plaintiff had reason to feel that the Marine Corps’ use of the field was different from anything contemplated by plaintiff when it leased the field. All the same, plaintiff may well have decided to release its claim anyway in order to get what the Government was offering.
Plaintiff’s legal position was, after all, not too strong. True, it had the right to receive all the lessee’s improvements that the defendant chose not to remove. But the Government could freely remove all improvements that were not put in by plaintiff itself; it still had over 12 years’ tenancy rights in the leasehold; and, also, it could buy up the whole 318^ acres with all improvements for $35,000. It could hardly be thought that the Government would spend more than $35,000 to repair someone else’s field (save it were impelled by motives of some other public policy) when it could purchase the whole field for $35,000.
The value of the improvements on plaintiff’s 31814 acres was $174,000 in 1948. Plaintiff had spent $15,965 on improvements in 1940. The record does not disclose what value these original improvements would have had in 1948. Un.doubtedly any increase due to inflation was partly offset by normal depreciation. But even if we allow a generous amount *670 for the value of plaintiff’s improvements in 1948, we still must conclude that the value of all other improvements, none of which were made at plaintiff’s expense and all of which were given to plaintiff, greatly exceeded the sum needed to repair the landing mat in 1948. In addition the United States gave plaintiff 71.77 acres with all improvements thereon, constituting an additional value of $40,000.
The plaintiff asserts that some parts of the property it did not want and could not use, and that the most essential installation of the airport, its landing mat, was in need of major repairs. The evidence shows, however that hangars and other valuable improvements were being utilized by plaintiff at the time the testimony was taken. In view of all the circumstances, we cannot escape the conclusion that the plaintiff received far greater value both in the improvements and the gift of 71.77 acres of land than the total amount it had invested in the property, and that the equities therefore are not in its favor.
We find that the plaintiff has no legal or equitable claim against the United States.
This opinion and the findings of fact, with the conclusions therein, will be certified to the Congress pursuant to House Eesolution 215, 83d Congress, 1st Session.
Laramoee, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a county of the State of California and as such is authorized to maintain suit in its capacity as a county.
2. House Eesolution 215, 83d Congress, 1st Session, adopted May 19,1953, provides as follows:
Resolved, That the bill (H. E. 2294) entitled “A bill for the relief of the County of Eiverside, California,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; *671 and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
The plaintiff claims under section 17 of the Federal Airport Act for the costs of rehabilitation and repair to its “public airport,” which premises were substantially damaged by a Federal agency between the spring of 1945 and the spring of 1948.
3. On or about August 13, 1940, the plaintiff purchased 31814. acres of agricultural lands within Riverside County in six contiguous parcels from various owners at a total price of $17,800. This was done as a contribution to the war effort and in order to make the location available as a site for training Air Corps cadets by the Ryan School of Aeronautics which had contracted with appropriate agencies of the defendant for such training.
4. In the printed notice of intention to purchase real estate by the Board of Supervisors appeared the following:
Notice is hereby given that the Board of Supervisors intends to purchase certain lands within Riverside County for airport purposes * * *
5. The plaintiff on August 26,1940, entered into a lease of the 318% acres referred to above with the Ryan School of Aeronautics, hereinafter sometimes referred to as “Ryan.” The lease is in evidence as a part of plaintiff’s exhibit 1 and is incorporated into this finding by reference. It provides in part as follows:
Whereas, the Lessor is the owner of that certain real property particularly described in Exhibit “A”, which said Exhibit is attached hereto and made a part hereof with the same force and effect as if set out at length herein, which said real property is located in the vicinity of the City of Hemet, and to the South and West thereof, and within the County of Riverside, consisting of three hundred eighteen and one-half (318%) acres, more or less, and,
*672 Whereas, the Lessee desires to lease and use said real property for the purpose of constructing and maintaining all necessary facilities for training purposes in connection with the aircraft industry and for the purpose of training by the Lessee of aircraft pilots and technicians, both private and for the United States Government, or any agencies thereof, as well as for manufacturing processes and housing and messing facilities and public canteen, all in comiection with and incidental to the aircraft industry.
* * * * *
It is agreed, in addition to the foregoing covenants and provisions, that this Lease is granted and accepted upon the following terms and conditions:
The lessor :
1. Immediately upon the execution of this Lease, shall remove from said leased premises any and all trees, buildings, and obstructions, and shall grade and level such portion or portions of said leased premises as necessary for the purposes herein stated, said portion or portions to be designated by the Lessee on the date of the execution of this Lease :
2. Immediately upon the execution of this Lease, shall oil three million (3,000,000) square feet of said leased premises at such place or places as by the Lessee designated, such designation to be made by the Lessee on the date of the execution of this Lease, the specifications therefor to be determined by the Lessor, with the understanding, however, that the extent, kind, and application of said oil shall be sufficient, upon the completion of the application thereof, to avoid and prevent the rising of excessive dust clouds from training activities at the place or places so designated and so treated.
3. Immediately upon the execution of this Lease, shall cause to be removed the 33,000 volt power line and poles of the Nevada-California Electric Corporation now paralleling the East side of said leased premises to a location not less than one-half (y2) mile therefrom; and,
4. For and in consideration of the promises and covenants herein contained and for the additional consideration of Ten Dollars ($10.00) paid by the Lessee to the Lessor, receipt of which is hereby acknowledged, does hereby grant and give to the Lessee the right and option to purchase from the Lessor on or before the termination of this Lease, or any extension thereof, the real property herein leased, together with any and all appurtenances thereto appertaining, for a total purchase price of *673 Thirty-five Thousand Dollars ($35,000.00) cash, upon the following terms:
(a) Should the Lessee elect to purchase said property, it shall give the Lessor notice in writing of its intention to exercise this option and to purchase said Land, and shall deposit one-half (%) of said purchase price in .escrow; then,
(b) The Lessor shall have thirty (30) days in which to deliver good and marketable title, free and clear of encumbrances and liens other than rights of way and reservations of record, whereupon the balance of the said purchase price shall be deposited with the escrow holder by the Lessee; and,
(c) Upon the exercise of said option all rentals and taxes shall be prorated as of the date of the delivery of ■the deed; it being, however, mutually understood and agreed, that, should any court of competent jurisdiction hold the provisions in this Lease relating to the option to purchase to be invalid, such holding shall in no way ,-.affect the remaining provisions of this Lease.
It is mutually understood and agreed that any and all structures, buildings, works, and improvements placed upon or attached to the said leased premises by the Lessee shall not become a part of the realty but shall be and remain the personal property of the Lessee, who may remove said structures, buildings, works, and improvements, or any of them, at any time while this Lease, or any extension thereof, remains in force and effect, or upon the expiration of said Lease, or any extension thereof; but in the event that the Lessee shall remove any or all of said structures, buildings, works, and improvements during the five (5) years next following the execution of this Lease, and does not immediately replace the same with other structures, buildings, works, or improvements of equal or greater value, and thereby reduces the fair value of the remaining structures, buildings, works, and improvements on said premises to less than Fifty Thousand Dollars ($50,000.00), then and in that event the provisions of Paragraph numbered 5 in this Lease shall immediately apply, and the obligation of the Ten Thousand Dollar ($10,000.00) Performance Bond provided in Paragraph (b), page five hereof shall immediately attach and said Lessor may resort to said Bond for the recovery of said monies as liquidated damages.
The lessee covenants and agrees :
1. Immediately upon the execution of this Lease, to .begin and prosecute to completion, without unreason *674 able delay or interruption, such structures, buildings, works, and improvements, which, upon the completion thereof, shall be of a fair value of not less than Fifty Thousand Dollars ($50,000.00) ;
*****
3. That said structures, buildings, works, and improvements shall be completed within a period of not to exceed six (6) months subsequent to the execution of this Lease;
4. To protect, preserve, and maintain all structures, buildings, works, and improvements placed upon said leased premises in such manner and way that the value thereof to the amount of Fifty Thousand Dollars ($50,000.00) shall be maintained at all times during the period of five (5) years immediately following and succeeding the date of the completion of said structures, buildings, works, and improvements, except alone as reduced by usual and ordinary depreciation; or,
5. Should the Lessee, after the completion of structures, buildings, works, and improvements to the fair value of Fifty Thousand Dollars ($50,000.00) as here-inbefore provided, but prior to the expiration of five (5) years thereafter, remove from said leased premises any or all of said structures, buildings, works, and improvements and fail to immediately replace the same by other structures, buildings, works, and improvements of equal or greater value, then and in that event the Lessee further covenants and agrees to forthwith and immediately pay or cause to be paid to the County of Riverside, as liquidated damages, monies equal with and equivalent to the monies which would have been due and payable to Riverside County as a tax on personal property and improvements on the valuation of the personal property so removed for the remaining portion of the said 5-year period, during which period said reduced value, by virtue of said removal, continues to-exist; * * *
*****
It is mutually understood and agreed :
1. That this Lease shall not be assigned by the Lessee without the prior written consent of the Lessor thereto;
2. That, should the Lessee,
(a) Upon the expiration of this Lease, or any extension thereof, permanently remove any or all of the said structures, buildings, works, and improvements, or
(b) At any time prior to the expiration of this Lease, or any extension thereof, remove any *675 or all of the said structures, buildings, works, and improvements and fail to replace the same, the particular place or places on said leased premises from which the said structures, buildings, works, and improvements are removed shall be restored to the original condition thereof existing at the time of the construction of the structures, buildings, works, and improvements so removed, excluding surfacing improvements;
* # * * *
The period of the lease was for five years at an annual rental of $500 per year with the option on the part of the lessee to renew for three successive five-year periods.
6. Pursuant to the terms of the lease the plaintiff proceeded to remove all trees, buildings, and obstructions and to accomplish some grading and leveling. It also applied road oil to an area of approximately three million square feet of the leased land. All of the above operations were performed at a total cost to the plaintiff of $15,965. Apart from the cost to the plaintiff of the land itself, this was the total expenditure made by the plaintiff relating to such land or any' improvements to it until April 1948.
7. Eyan proceeded to install certain structures on the land such as five hangars, one of which included a control tower. Other structures erected by Eyan included mess and recreation hall, kitchen, administration building, class rooms, and living quarters for cadets accommodating eight men per unit, with a total accommodation of 248 cadets. Two wells were placed on the property to furnish the necessary water, and a complete sewage disposal system was also installed.
8. The property became known as Landing Field, Hemet, California, Eyan School of Aeronautics, and also as the Byan-Hemet Field. It was used by Eyan for the purpose of instruction of Air Force cadets.
9. On December 31, 1941, the plaintiff entered into a formal written agreement with Eyan whereby the plaintiff consented to the assignment of the lease, referred to in finding 5, by Eyan to the United States, acting through the Defense Plant Corporation, hereinafter sometimes referred to as DPC.
10. On February 25,1942, Eyan assigned or transferred all of its rights under the lease from the plaintiff to the 318^ *676 acres of land, together with the buildings and improvements located on the premises, to the Defense Plant Corporation, a corporation created by the Reconstruction Finance Corporation. The DPC purchased the facilities Ryan had installed at the field for $280,092. Apparently DPC purchased the Ryan School facilities and leased them back to Ryan.
11. Thereafter, the United States, acting through the Defense Plant Corporation, purchased in fee an adjoining tract of 71.77 acres of land at a cost of $7,438. This property was separated from the landing mat on the 318% acres of leased land by the tracks of the Santa Fe Railroad. DPC constructed on the 71.77 acres a hospital, administration building, 24 additional barracks accommodating 224 additional cadets, and the outfall for the sewage disposal system for the combined property of 390 acres.
12. The field was utilized by Ryan both before and after the assignment by it to DPC as a training field for the instruction of Army aviation cadets under an arrangement between Ryan and the Army Air Corps until about January 1,1945.
13. The original landing area, which was put in by plaintiff, was 2,828,943 square feet. This area was resurfaced and enlarged by the surfacing of an additional 1,309,226 square feet about May 1943. This cost was borne by DPC and was in excess of $100,000. The enlarged landing area or landing mat was generally rectangular in shape (approximately 1800 by 2200 feet) and covered an area of slightly over 4,000,000 square feet.
The 1,309,226 square-foot area was surfaced with %-inch oil mix and the balance with about 1%-inch oil mix. The parking apron, an area of 27,014 square feet immediately in front of the hangars, had a more substantial asphaltic concrete mix.
14. From the time of the resurfacing of the original area and the surfacing of. the additional area referred to above until the end of the period of the training of Army aviation cadets by Ryan, the landing area of the field was in a very good state of repair and was well maintained. The training planes using the field during this period were no heavier than 3,000 pounds.
*677 15. By October 26,1943, the DPC expended the following amounts at the Ryan-Hemet Field:
Buildings_$225,983.66
Building improvements_ 33,274.07
Leasehold improvements_ 178,724.04
Off leasehold improvements_ 1,375.00
Engineering expense_ 178.68
439, 535.35
Land cost_ 8,273.20
Total cost, land improvements_ 447,808.55
This amount was increased to $470,144.89 by June 1947.
16. At the close of training operations at the field on about January 1, 1945, the Reconstruction Finance Corporation, the parent corporation of the DPC, used a portion of the field as a sales depot for the disposal of surplus airplanes.
17. By letter of March 12,1945, the Chief of Naval Operations requested the use of Ryan Field from the Defense Plant Corporation to fulfill an emergency requirement in the training of Marine Corps pilots in carrier practice landings and take-offs. This permission was granted by a reply of the same date suggesting that the local office of DPC be contacted regarding the specific facilities needed. On March 30, 1945, a further letter was written to DPC outlining the specific facilities needed (a portion of the landing mat, barracks and messing facilities). On March 31, 1945, permission was given by letter for the use of the facilities requested.
Permission from the plaintiff for the use of the field by the Marine Corps was neither sought nor granted.
18. From about April 1,1945, until November 1,1945, the Marine Corps did use the field for its carrier practice landings. As a result of such use the landing mat was damaged, due primarily to the weight of the planes used in such practice landings and the strong slipstream caused by their powerful engines. The planes were known as finimma.ii fighters and TBM torpedo bombers. Some R4D’s were used to transport men and equipment to and from the field. The above-mentioned planes ranged in weight from about 25,000 to 30,000 pounds compared with the weight of the training *678 planes used when Byan had used the field for training Army cadets, which planes weighed no more than 3,000 pounds.
19. By the end of April 1945, the Commanding Officer of the Marine Corps Air Station at El Toro, California, requested-authority through channels to construct two “bounce strips”, 80 by 300 feet, in the northeast corner of the landing mat at an estimated cost of $9,900. Although the authority was given by the middle of July 1945, the work was not accomplished.
20. Apparently the carrier practice landings were slowed down, if not completely stopped, at the cessation of hostilities in World War II (August 14,1945), because on September 10, 1945, the EFC Assistant Manager at Los Angeles by letter requested the Marine Corps to “put this landing mat in a good state of repair and notify us when repairs have been made.” The letter stated that a representative of the EFC had recently inspected the landing mat on the field and had reported that it was in a poor state of repair and that it was unsafe for certain types of planes to land on it.
21. The Commanding Officer of the Marine Corps Air Station, El Toro, California, on October 9, 1945, wrote to the Chief of the Bureau of Yards and Docks, Navy Department, stating that if there was a lease agreement (between EFC and Marine Corps) in existence requiring the restoration of the landing mat to as good condition as was the case before April 1,1945, then the following work should be done before returning the field to the lessor:
(a) The existing damaged areas should be harrowed, pulverized by means of pub mill, and rerolled, to an even grade. Aggregate should be added where necessary.
(b) MC2 road oil should be applied at the rate of 0.3 gallons per square yard.
(c) Coarse sand should then be applied at the rate of 20 to 25 pounds per square yard and rolled.
(d) The entire area, with the exception of that area where grass existed at the time that the property was leased, should be covered with SC-6 at the rate of 0.15 gallons per square yard. This application should then be followed with a covering of medium screenings * * *.
The letter further stated that the work described above could be accomplished with Navy Public Works forces at an esti *679 mated cost not to exceed $19,000 plus $500 for the removal of a catapult.
The Commander, Naval Air Bases, 11th Naval District, by endorsement of October 30 attached to the above-mentioned letter, recommended that Ryan Field, Hemet, be disposed of by termination of the DPC agreement for Navy use of the property. This endorsement reads in part as follows:
6. The basic letter requests authority to repair the landing mat using Public Works maintenance forces and accrued maintenance funds. Every day that passes makes Navy accomplishment of this work more difficult. The discontinuance of Navy use of Ryan Field has necessitated release of Public Works maintenance forces at Hemet. Carrying out the restoration work would now mean the diversion of personnel from the already reduced maintenance force at Marine Corps Air Station, El Toro. Furthermore, the approaching rainy season will be a menace to efficient prosecution of the work. In view of the circumstances, it is recommended that in the negotiations for the settlement of the agreement, the possibility be explored of making an equitable cash settlement in lieu of Navy restoration. From the standpoint of the lessor, it would seem that it would be only coincidence if exact restoration would be the best application of funds for post war use of the property.
7. If a cash settlement is entirely unacceptable to Defense Plant Corporation, and the Navy is held strictly to the terms of the agreement, it is recommended that the repairs outlined in the basic letter be accomplished by contract. The $19,000 quotation in the basic letter covers only labor and materials so it is expected that a fair contract price would be considerably more than this. By copy of this endorsement the Commanding Officer, Marine Corps Air Station, El Toro, is requested to prepare and submit a detailed estimate of the cost of the necessary repairs based on accomplishment by contract.
22. The Commanding Officer of the Marine Corps Air Station, El Toro, California, on November 7,1945, wrote to the Commander, Naval Air Bases, 11th Naval District, giving a detailed estimate of the cost of repairs to Ryan Field in the following terms:

*680
Repair Damageé Area Approximating 60,000 Square Tarda

Harrow, pulverize and. roll 60,000 square yards
at 5$ per square yard_$3,000
18,000 gallons Mc2 road oil at 5# per gallon- 900
600 tons of coarse sand at $2.50 per ton_ 1,500
Common Labor_ 600 $6,000'

Apply Seal Coat and Screenings to Approximately 415,000 Sq. Yds*■

105,000 gallons SC6 oil at 6$ per gallon-$6,300
4,150 tons %-ineb screenings at $2.50 per ton_10,375
Broom and Roll- 2, 000
Common Labor_ 1,325 $20,000'
Sub-total_ $26,000
Contingencies @ 10%_ 2,600
Profit @ 10%_ 2,860'
Total_ 31,460'
(Say)_ 31,500'
4. Due to the uncertain extent of work to be accoxn-Elished in the repair of this field, it is suggested that ids received from contractors be on a unit price basis for the various items of work to be performed.
5. This command would be pleased to have the repair work accomplished by contract as there are no personnel now available at Hemet for this purpose. Tie-pairs by station personnel will require the use of El Toro personnel and will interfere with regular station maintenance work.
23. In the meantime, all Marine Corps activities left Ryan Field about November 1,1945. The Chief of Naval Operations on that date declared Ryan Field surplus to the needs, of naval aviation as of that date.
24. On November 23, 1945, the Commander, Naval Air Bases, 11th Naval District, wrote to the Chief of the Bureau of Aeronautics of the Navy as follows:
1. Reference (a) recommended that Ryan Field, Hemet, be disposed of by termination of the Defense Plant Corporation agreement for Navy use of the property. Commander, Naval Air Bases, Eleventh Naval District, by endorsement to reference (a), recommended, that in the return of the field, an equitable cash settlement be substituted, if possible, for any Navy restoration, work required under terms of the agreement. The endorsement further recommended that necessary repairs-be accomplished by contract, rather than by station maintenance forces, if a cash settlement is not acceptable.
2. In reference (b), the El Toro station has submitted *681 an estimate of the cost of restoring the property to original condition, less reasonable wear and tear. This estimate, totaling $31,500, is based on accomplishment of the work by contract. It is requested that the Public Works Officer, Eleventh Naval District, review this estimate of cost by contract.
3. Reference (c), supplying revised planning information for the roll-up of continental aviation activities, lists Ryan Field, Hemet, as a field to be retained. The Commander, Naval Air Bases, Eleventh Naval District, considers that retention of Ryan Field will serve no useful purpose and therefore recommends that it be disposed of.
By first endorsement the Chief of Staff of the 11th Naval District forwarded the letter to the Bureau of Aeronautics, with the concurrence of the Commandant, and stated that the restoration cost had been reviewed and appeared to be correct.
The above letter was in turn forwarded to the Chief of the Bureau of Yards and Docks, calling his attention to a letter that had been written on December 4, 1945, requesting that Bureau to dispose of the field as surplus property as of that date.
25. After the Marine Corps relinquished possession of the premises, they were used by the War Assets Administration, successor to the War Assets Corporation, for the storage of surplus aircraft and other surplus property which was being disposed of by sales held on the premises.
26. After November 1, 1945, no further maintenance of the landing mat was accomplished by either the Marine Corps or RFC.
27. On February 15, 1946, the chairman of the Board of Supervisors of the County of Riverside sent the following letter to the War Assets Administration:
It is our understanding that the War Assets Corporation has been designated as the disposal agency of airports under Federal control which have been or are to be declared surplus. It is because of this understanding that we now direct this communication to you.
As you may know, the Ryan Airport, sometimes referred to as the Hemet Airport because it is near the City of Hemet in this County and State, consists of 388 acres of land, together with the existing improve *682 ments thereon. In the beginning, and approximately five years ago, 318 of the 388 acres was acquired by the County of Riverside in fee. The County purchased this land as one of its acts constituting a contribution to-the war effort and to facilitate the establishment of a training school for Air Corps cadets which training was the subject of a contract between the Federal government and the Ryan School of Aeronautics. Subsequent to the purchase of the 318 acres by the County and the establishment of the field, the field was enlarged through the purchase by the Federal government of an additional 70 acres of contiguous land. The mat and the principal buildings, including five hangars, are located upon the land belonging to the County.
Upon this land being purchased by the County the same was immediately thereafter leased to the Ryan School of Aeronautics, which lease was recently assigned to the Defense Plant Corporation, and, unless extended pursuant to its provisions, will expire during the month of August of this year.
This field is not now being actively employed or used for any Federal purposes and we understand the same has been or forthwith will be declared to be surplus.
Under the terms of the existing lease under and by virtue of which an agency of the Federal Government presently holds possession, all improvements placed upon the land belonging to the County revert to the County upon termination of the lease unless removed by the owner, in which latter instance the owner is obligated to restore the land to its original condition.
Riverside County has heretofore notified Congressman John Phillips, Senator Downey and the Reconstruction Finance Corporation that the County desires to exercise the priority given to it by law and requests that the government cause to be conveyed to the County all right, title, and interest which the government may have in and to this property upon the same being declared surplus.
Through our representative in Congress we have heretofore requested an interim permit holding said property pending the time the same is declared to be surplus.
It has come to the attention of the County that recently the City of Hemet communicated with certain authorities in 'Washington, D. C., expressing its desire to procure this property. This request on the part, of the municipality was born of some local confusion which has now been clarified and we understand that the City of Hemet has withdrawn any requests or applications *683 which it has heretofore filed in connection with this property.
In view of all of the above premises, the Board of Supervisors of this County has authorized me to communicate with you, making known its application and request in connection with this air field and soliciting your attention and assistance in conveying to the County that portion of the said premises, together with the improvements thereon, title to which is now vested in the Federal Government.
28. Ryan Field was reported to the War Assets Administration for disposal on March 1, 1946. The record is not entirely clear on the point, but it appears that the field was actually declared surplus at about that time. Thereafter extensive negotiations were had between the parties, the plaintiff seeking to obtain the return of the 318% acres of land with improvements made thereon, together with the 71.71 acres which the defendant owned in fee, as well as improvements located thereon. The County of Riverside, by a formal resolution of March 18, 1946, handed to representatives of the Los Angeles office of War Assets Corporation, requested the defendant to convey for a nominal consideration all of its (the defendant’s) right, title, and interest in and to the field to the County of Riverside. Pending such ultimate transfer the county requested that it be given a revocable interim permit covering the entire fiel and improvements thereon. This was forwarded by the local War Assets Corporation to its Washington office.
29. The Civil Aeronautics Administration recommendation concerning the field was requested relative to its disposition by War Assets Administration. Such recommendation was furnished in June 1946. CAA recommended that the land leased from the county with the extensive improvements located thereon be returned to the county and that the land owned by the defendant with its improvements be classified as airport property and be transferred to the county. As to the landing mat, it was noted that its condition was poor and that it had received no maintenance.
30. On October 21, 1946, the chairman of the Board of Supervisors of the County of Riverside submitted a written *684 application to the War Assets Administration for the conveyance and transfer to the county of all the right, title, and interest of the Federal Government in and to Kyan Field. The letter stated in part as follows:
In this connection the landing mat on these premises was substantially damaged by the Marine Corps when it occupied these premises, which damage the Marine Corps, or the Federal Government, has failed to repair. The Civil Aeronautics Administration has heretofore estimated the damages at $55,000, or, in other words, has determined that it would cost $55,000 to restore the mat to serviceable condition. The Civil Aeronautics Administration has recommended that the Federal Government, at its expense, restore the mat to serviceable condition prior to its transfer of interest to the County of Riverside. In view of these facts and in making this formal application the same is made on the condition that the County not be held responsible for the damages incurred to the mat by the agencies of the Federal Government.
31. There is no satisfactory evidence in the record that the CAA did in fact determine that $55,000 would be required to place the landing mat in serviceable condition.
32. The chairman of the County Board of Supervisors, on October 21, 1946, also wrote to the Secretary of the Navy calling upon that official to see to it that the Navy Department or the Federal Government repair the damage to the landing mat. His attention was also directed to a recommendation of CAA that the cost of restoration would be no less than $55,000.
33. The chairman of the County Board of Supervisors wrote the following letter to the Assistant Chief of the Bureau of Yards and Docks, Navy Department, on November 15,1946:
This will acknowledge receipt of your letter dated November 9,1946, in response to our letter addressed to you relative to the above subject.
In reference to your letter and also to get the factual situation straight, may I say to you that the Ryan Air Field (or 818y2 acres thereof} was leased by the County of Riverside to the Ruan [sic] School of Aeronautics in 1940. That lease contained a provision prohibiting its assignment or transfer by the lessee without the prior *685 written consent of the lessor. In due course the Defense Plant Corporation made known its desire to take over this Field from the Ryan School of Aeronautics. In an endeavor to cooperate with the Government’s war effort the County of Riverside gave its written consent to the Ryan School of Aeronautics to assign the lease to the Defense Plant Corporation upon the condition that the assignee of the lessee should observe all the conditions of that instrument with the same fidelity as required of the original lessee. The lease, pursuant thereto and in conformity therewith, was assigned by the Ruan [sic] School of Aeronautics to the Defense Plant Corporation. Therefore, I must add that the County of Riverside has never executed a lease covering the Ruan [sic] Air Field to the Reconstruction Finance Corporation or to any other Federal agency other than the Defense Plant Corporation. It may be that the Reconstruction Finance Corporation in due time swallowed or absorbed the Defense Plant Corporation, but the lease in question was and is assigned to the Defense Plant Corporation and to none other.
It was approximately a year, or maybe more, after the Defense Plant Corporation had taken possession of the Field under the above mentioned assignment that the County learned that the Government, I will say, had permitted the United States Marine Corps to occupy the Field. The County, the commanding officer, and everyone interested in the Field, knew, in fact it was a matter of common knowledge, that the activity of the United States Marine Corps aircraft was doing substantial damage to the mat of the Field without any effort or concern to repair the damage or maintain the mat.
As time went on it was disclosed that the United States Marine Corps aircraft was about to terminate its use of the Field and be transferred or sent elsewhere. It was at that time that the County of Riverside, as owner of the property and lessor, contacted the commanding Marine Officer, requesting that his agency or the responsible governmental agencies, repair the damage which they had done and restore the mat to serviceable condition. This the commanding officer promised to do.
In your letter of November 9th you employ this language:
“At the conclusion of the use of Ryan field, when the question of restoration was being discussed, it was agreed that action on this matter would be held in abeyance until the post-war plans for the use of the field by the Government had been finally deter *686 mined. This was deemed advisable in that it would allow the Government to negotiate with the Lessor for the transfer of improvements in lieu of restoration in the event disposal was made of the property.”
If there ever was any such “agreement” as mentioned in your letter, it was entirely unilateral on the part of the Government or its various agencies because the County of Riverside knows of no such agreement and has never been and is not a party thereto. If it has been heretofore “deemed advisable” to negotiate with the lessor for the transfer of improvements in lieu of restoration, the County’s first knowledge of that determination rests in your letter of November 9th.
The further facts are that the Civil Aeronautics Administration has heretofore and pursuant to governmental requirement surveyed the Ryan Air Field and reached a determination and recommendation as to the exact portion or parts thereof which are necessary and essential for the continued operation of the Field as an airport. This recommendation was furnished to the War Assets Administration and that part of the property so found and determined by the Civil Aeronautics Administration as essential for airport purposes has been declared surplus. Of course, the landing mat is included — the same landing mat damaged and made unserviceable by the Marine Corps. The Civil Aeronautics Administration recommended that the Government repair the damage which it has done and restore the Field to serviceable condition prior to the disposal of the property as airport property.
It is also a fact that on the 8th day of November, 1946, Colonel A. J. Read, War Assets Administration, Los Angeles Office, forwarded to Washington, D. C., his written recommendation for the transfer to the County of Riverside of all of the property designated by the Civil Aeronautics Administration as necessary for airport purposes, said property subsequent to transfer to be operated by the County as a public airport.
Riverside County has spent a lot of time and effort dealing with a legion of governmental agencies in an effort to receive back, unburdened by the leasehold, the property, fee title to which is in the County, and which the County at its own financial loss made available to the Government and its agencies in an endeavor to assist the war effort. It is, therefore, hard to appreciate the -continual shifting of responsibility and forestalling decisions which are patently obvious if the Government, and its agencies, proposes to meet and satisfy its obliga *687 tions in the same maimer and way as private citizens are by law required to do.
In view of all of the above facts, each and every one of which can be conclusively verified and established, on behalf of the County of Riverside I again request .that the Navy Department, that being the Department visiting the damage to this Field, cause the same to be ■restored and repaired because as a result of that damage the landing mat of the Field has been placed in an unserviceable and unsafe condition for airport purposes.
'34. On November 19,1946, the Director, Airports Division, 'Office of Real Property Disposal, War Assets Administration, wrote to the Bureau of Yards and Docks, Navy Department, in pertinent part as follows:
The Civil Aeronautics Administration has recommended that certain Government-owned land adjacent to the airfield, leased from the County of Riverside, together with hangars and certain other improvements, be transferred to the County of Riverside as Airport property. Accordingly a letter of instructions from this .office has been sent to our Regional Office at Los Angeles, California, covering the transfer of the property. It is anticipated that the County of Riverside will be required to waive any claims it has or may have against the United States under the lease, if it accepts title to the improvements and facilities proposed for transfer.
The information quoted above was communicated to United •States Senator Sheridan Downey in response to an inquiry from him in the matter.
35. On November 29, 1946, the Acting Deputy Regional Director for Real Property Disposal sent the following letter ■to the plaintiff:
Reference is made to your telephone conversation of November 27, 1946 with this office relative to Plancor ■459, Ryan School of Aeronautics, Hemet,_ California, and concerning a $55,000.00 restoration claim that your ■•County has made to the Navy Department, Washington, D. C. for damage done to the facility during the period of its occupancy.
It is anticipated that the County of Riverside will be required to waive any claims it has or may have against the United States under the lease, if it accepts .title to the improvements and facilities proposed for .transfer under WAA Regulation No. 16.
*688 In order that this office may consider the application of the County of Riverside, dated October 21, 1946, it will be necessary that this office receive a waiver in writing in order that we may expedite the disposal of the subject facility.
36. By letter dated March 24, 1947, the County of Riverside again requested the transfer of the Government-owned property and improvements to the county.
37. By a resolution dated April 7, 1947, passed by the Board of Supervisors of Riverside County, the county agreed to accept the transfer of the Government-owned facilities and improvements “on such usual and ordinary conditions as the Government requires in the disposal of airport property * *
38. By a letter dated August 13,1947, the War Assets Administration informed the plaintiff that the counterproposal contained in the plaintiff’s resolution of April 7,1947, could' not be substituted for the regulations of the War Assets Administration with respect to the disposal of Government property. In a letter dated August 19, 1947, the Board of Supervisors of Riverside County acknowledged that letter from the War Assets Administration and, after restating the lengthy negotiations which had occurred, then stated:
It has heretofore been called to your attention that during the brief period of time when the United States Navy was in occupancy of this field that through its use, Marines being stationed there, visited damage upon installations estimated by the Civil Aeronautics Administration at $55,000.00. These things we are willing to overlook. * * *
39- On February 27, 1948, the chairman of the County" Board of Supervisors executed and submitted to the War Assets Administration an application for the transfer of surplus property under the Surplus Property Act of 1944, as amended, such property consisting of the 71.59 acres, more or less, owned in fee by the Government and 318y2 acres leased (from the County of Riverside), together with all improvements on both parcels. Paragraph 4c (2) of such application reads as follows:
(2) That the applicant shall grant or obtain for the-benefit of the United States a release from any and all *689 liability it may be under for restoration or other damages under any lease or other agreement covering the use by the United States of the airport, or part thereof, owned, controlled, or operated by the applicant, upon which, adjacent to which, or in connection with which, the surplus property applied for herein was located or used: provided, that no such release shall be construed as depriving the applicant of any right it may otherwise have to receive reimbursement under section 17 of the Federal Airport Act for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency.
40. By quitclaim deed of June 4, 1948, the defendant, in consideration of the assumption by the grantee of all the obligations and its taking subject to certain reservations, restrictions, and conditions, and its covenant to abide by certain other reservations, quitclaimed all of the defendant’s right, title, and interest in and to the 71.77 acres of Government-owned land with all improvements and also surrendered its leasehold interest in and to the 318% acres. Paragraph 7 of such quitclaim deed reads as follows:
(7) The Grantee does hereby release the Government, and will take whatever action may be required by the War Assets Administration to assure the complete release of the Government from any and all liability the Government may be under for restoration or other damages under any lease or other agreement covering the use by the Government of the airport, or part thereof, owned, controlled or operated by the Grantee, upon which, adjacent to which, or in connection with which, any property transferred by this instrument was located or used; Provided, that no such release shall be construed as depriving the Grantee of any right it may otherwise have to receive reimbursement under Section 17 of the Federal Airport Act for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency.
The County Board of Supervisors by formal resolution on June 14,1948, accepted the quitclaim deed and directed that it be recorded in its land records.
41. The Board of Supervisors of the plaintiff on November 24, 1947, adopted Ordinance 334 providing for an airport commission, for the appointment of its members, for their *690 powers and duties and for the administration of airports in the County of Riverside, and for other purposes.
42. Pursuant to the above-described ordinance, the county on April 1, 1948, employed T. T. Hannah as its director of airports.
43. Prior to the employment of Mr. Hannah, Ryan Field was never operated as an airport for the general public. The plaintiff was not until April 1948 in possession of the premises since the land on which the field was constructed had been leased to Ryan on August 26, 1940.
44. After adoption of a resolution by the Board of Supervisors on January 16, 1950, the plaintiff submitted to the Civil Aeronautics Administration its application pursuant to section 17 of the Federal Airport Act. In its application it sought reimbursement of $277,738.61, representing its estimated costs for rehabilitating and repairing the airport.
45. It is noted that in the above-mentioned application it is stated on page 6 thereof:
15. Statement to the effect that this request does not include reimbursement for the cost of rehabilitation or repair of facilities constructed with United States funds is herewith submitted and included in Resolution by the Riverside County Board of Supervisors, Page 2.
A reference to the resolution referred to, which is in evidence as a part of plaintiff’s exhibit 1, contains the statement approving the Request for Costs of Rehabilitation as prepared by the director of airports and authorizes and directs the chairman to execute and verify to the best of his knowledge and belief the said Request for Costs of Rehabilitation, and to certify that the said Request does not include any costs for rehabilitation or repairs of developments and facilities constructed with United States funds or by Federal agencies.
46. Since the plaintiff, as shown in finding 6, had expended only $15,965 over and above the cost of the land itself on Ryan Field up to April 1948, any damage done to the landing mat by the defendant beyond $15,965 was done to facilities constructed either with United States funds or by the Ryan School, which facilities were purchased by the defendant.
*691 47. The Civil Aeronautics Administration rejected the application for rehabilitation costs on the ground that the airport was not a public airport within the meaning of section 17 at or prior to the time the United States entered occupancy. By letter dated August 27, 1951, the plaintiff requested the 'Civil Aeronautics Administration to reconsider the application and, by memorandum of October 26, 1951, the Civil Aeronautics Administration confirmed the decision rejecting 'the application.
48. On January 29, 1953, a private bill, H. E. 2294, 83d Cong., 1st sess., was introduced for the relief of plaintiff and to authorize payment by the Secretary of the Treasury to the plaintiff of the sum of $277,738.61.
49. The bill, H. E. 2294, was not enacted, but there was introduced in the House of Eepresentatives and passed by that body on May 19,1953, H. Ees. 215, 83d Cong., 1st sess., which provided that the claim be submitted to the Court of Claims pursuant to sections 1492 and 2509 of Title 28, United States Code. That resolution was referred to the House Committee on the Judiciary, which submitted its report, H. Eept. No. 381.
50. In June 1948, the highest and best use of the entire property, consisting of the 318%-acre tract and the 71.77-acre tract, together with the buildings and other facilities, -was for airport purposes. However, the mat as presently designed is not suitable for a public airport because it is too large and would be uneconomical. The additional maintenance expense would be unwarranted.
51. In June 1948, the fair market value of the entire property in its then condition was $250,000 for its highest and best use.
52. In June 1948, the fair market value of the 7l.77-acre tract was $10,000. The fair market value of the improvements on that tract at that time was $30,000, making the land and improvements worth a total of $40,000 in June 1948. The fair market value of the improvements on the 31814-acre tract in June was $174,000
53. In its claim for restoring the entire landing mat, the •plaintiff estimated the cost of breaking up the existing sur *692 face, removing that material, and completely installing a new surface. However, the evidence established that the entire landing mat could be restored to good and serviceable condition by a method known to road construction engineers as the “pavement overlay.” Under this method the whole surface is merely scarified and a new surface is laid on top of the old surface. The fair and reasonable cost of restoring the entire landing mat by this method in June 1948 would have been $110,090. Use of that method would have restored the landing mat to a condition as good as and probably better than the original paving put in by the plaintiff:
54. Ryan Field has, since June 1948, been used as a public airport. Many of the improvements placed on the premises, both by Ryan and the defendant, including several hangars and other buildings, were being used by plaintiff for airport or revenue purposes at the time the evidence was heard.
55. Section 4056c, Political Code of California, provided in pertinent part as follows:
§ 4056c. Public airports and landing places: Acquisition, improvement, etc., of property: Employees and supplies: Special tax: Funds and transfer of moneys: Bonded indebtedness. The boards of supervisors of the several counties are hereby authorized and empowered, as a necessary adjunct to aerial transportation and the use of aerial highways, to provide and maintain public airports and landing places for aerial traffic for the use of the public. In furtherance of such purposes such boards of supervisors shall have jurisdiction and power:
(a) To acquire, by purchase, condemnation, donation, lease or otherwise, real or personal property, either within or without the incorporated territory of municipalities, necessary for such purposes, and to improve, construct or reconstruct, lease, furnish or refurnish, use, repair, maintain and control the same, including any and all buildings, structures, lighting equipment, and all other equipment and facilities necessary to such use.
Sections 1,4, and 4 (a) of the Municipal and County Airport Laws of California, 1989, provided in pertinent part as follows:
1. To acquire, by purchase, condemnation, donation, lease or otherwise, real or personal property, either within or without the incorporated territory of municipalities, necessary for such purposes, *693 or any town, or any municipal corporation, in tbe state of California, is hereby authorized and empowered to acquire by purchase, condemnation, donation, lease or otherwise real or personal property, or to use any real property owned by it, or which it may hereafter acquire, within or without its corporate limits for a site upon which an airport or airports may be maintained and upon which any such city and county or county or city or town or municipal corporation may erect and maintain or permit the erection and maintenance of hangars, mooring masts, flying fields, and all places for flying, take-off and landing of aircraft and the storage of the same when not in active use, together with signal lights, radio equipment, service shops, conveniences, appliances, works, structures and other air navigation facilities, now known or hereafter invented, of such number and character and in such places as may be necessary or convenient, and to levy taxes for the purpose of raising funds to acquire lands for the purposes mentioned in this act and to pay the principal and interest of any bonds issued pursuant hereto.
* * * # *
§ 4. Maintenance and operation of airports. In connection with the erection or maintenance of any such airport or airports, or air navigation facilities, any such city and county, or county, or city operating under a freeholders’ charter or otherwise, or town, or any municipal corporation, shall have the power and jurisdiction to regulate the receipt, deposit and removal, the embarkation or debarkation of passengers or property to and from such landing places or moorage as may be provided, to exact and require charges, fees and tolls, together with a lien to enforce their payment, to lease or assign for operation such space or area, appurtenances, appliances or other conveniences necessary or useful in connection therewith, to own and operate municipal aircraft, to employ pilots, to provide rules and regulations covering the use of such airport and facilities and the use of other property or means of transportation within or over the said airport, to perform any duties necessary or convenient for the regulation of air traflic, to enter into contracts or otherwise co-operate with the federal government or other public or private' agencies, and otherwise exercise such powers as may be required or convenient in the promotion of aeronautics and the furtherance of commerce and navigation by air.
§ 4a. Contracts with state and federal governments. Any municipal corporation or public agency operating. *694 or maintaining an airport or airports shall be empowered to grant leases, licenses, concessions and other privileges to the State or United States Government,, upon such terms and conditions as may be agreed upon, for the use or occupation of hangars, structures, works- or other aviation facilities thereof by the War Department, or the Navy Department, or the National Guard, or by other State or Federal departments or agencies in-connection with, or related to, the purposes of aviation or air commerce (including military aeronautics), and to acquire or construct such hangars, structures, works or other facilities on such airport or airports as may be required for such uses, or purposes, and to enter into-contracts with the State or Federal Government as may be deemed necessary or convenient therefor, subject to the limitations as to duration of term as may be provided by law for the granting of such leases, licenses, concessions or privileges to, or the entering into of such contracts with, private persons or agencies. [Added by Stats. 1989, ch. 461.]

 The provisions of the lease are somewhat contradictory as to the period during which Ryan was to maintain the value of its improvements at or above $50,000. One clause says five years after the execution of the lease and another provides for five years after the completion of improvements worth $50,000.

 See Note 1 above.

 The regulation was revised In 1958. The corresponding provision of the revised regulations is substantially the same and reads:
§ 560.5 Eligible airport. To be eligible, an airport must * * * meet the following requirements:
(a) * * * and the airport * *.» must have been used for public purposes under the control of a public agency at the time the damage occurred * * *.

 Section 17 (or its equivalent) of the original statute passed in 1946 was discussed briefly in a Senate Committee Report and in a House Conference Report of that Congress. Senate Report 224, 79th Congress, 1st Session, explains, at page 6, that section 17 (or its then equivalent)
* * * sets up a method for reimbursement for damage to public airports resulting from use by the Army or Navy * * *.
House Report 1828, 79th Congress, 2d Session, elucidates the purpose of section 17 in a passage on page 20 from which we quote this part:
By section 17 of the conference substitute the Administrator of Civil Aeronautics is authorized to consider, ascertain, adjust, and determine any claim submitted by a public agency for reimbursement of the cost of necessary rehabilitation or repair of a public airport, under control or management of such public agency, substantially damaged by any Federal agency.
The only committee report made upon the 1948 amendment to section 17 was House Report 2307, 80th Congress, 2d Session, which stated, in part:
The following letter from the Secretary of Commerce fully explains the bill and sets forth the reasons why it should be promptly enacted into law.
The legislative history of section 17 of the Federal Airport Act indicates that it was the intent of the Congress that municipalities whose airports were damaged by Federal agencies, particularly in connection with military operations during the war, were entitled to have such airports restored to their former condition at the cost of the Federal Government.
The debates do not shed any further light on the matter.